NOT FOR PUBLICATION                                                    (Doc. No. 45)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

_____
:
REBECCA L. HUEY,                                :
                                                :
            Plaintiff,                          :        Civil No. 09-0209 (RBK/AMD)
                                                :
        v.                                      :        **OPINION**
                                                :
WALGREEN CO.,                                   :
                                                :
            Defendant.                          :
_____        :

**KUGLER**, United States District Judge:

This matter arises out of alleged discrimination on the basis of age at a local drugstore.

Presently before the Court is the Motion for Summary Judgment by Defendant Walgreen Co. on

Plaintiff Rebecca Huey's hostile work environment claim and disparate treatment claim under

the Delaware Discrimination in Employment Act ("DDEA"). Plaintiff alleges that Defendant's

employee created a hostile work environment by (1) making frequent derogatory statements

about Plaintiff's age, and (2) treating Plaintiff differently than other similarly situated employees

by refusing to promote Plaintiff, terminating Plaintiff's employment, and taking other

unwarranted disciplinary measures against Plaintiff. Defendant argues that Plaintiff's hostile

work environment claim fails because the work environment at the drugstore was not abusive,

and did not alter the conditions of Plaintiff's employment. Defendant also argues that it had

legitimate, nondiscriminatory reasons for terminating Plaintiff's employment, refusing to

promote Plaintiff, and repeatedly disciplining Plaintiff. For the reasons expressed below,

1

Defendant's motion will be granted.

## I.     BACKGROUND

Rebecca Huey, a forty-six year old woman, began working as a part-time cashier at Happy Harry's drugstore in Milford, Delaware in October 1999.  Huey was promoted to the position of Manager Trainee in January 2000, and eventually attained the position of Assistant Manager.

In mid-2006, Walgreen Company ("Walgreens") purchased Happy Harry's.  On or about March 2007, Huey was transferred to the Walgreens store in Magnolia, Delaware.  At the time of the transfer, Huey was approximately forty-three years old.  After the transfer, Huey maintained her position as Assistant Manager.  Huey's two immediate supervisors were Fay Lance, the Store Manager, and Debra Allan, the Executive Assistant.  Hope Hampton was the store's other assistant manager.

Huey's problems at Walgreens began in July 2007, shortly after Walgreens hired Mr. Charles Cassidy, Jr. as Store Manager.  For the first few months of Cassidy's tenure at Walgreens, he had a cordial working relationship with Huey.  However, their relationship began to quickly deteriorate shortly after an incident involving Cassidy and Allan.  After a dispute between Allan and Cassidy concerning the store's operating procedures, Huey informed Cassidy that she did not believe that he was treating Allan fairly.  According to Huey, "my sticking up for Debra Allen is why [Cassidy] didn't like me.  Therein lies everything that happened after that." (Huey Dep. 208:24-209:3.)

Between July 2007 and March 2008, Cassidy made a variety of abrasive remarks concerning age and gender to Huey and other employees.  According to Huey, when she stated

that she was "hot" one day, Cassidy replied, "that's probably just menopause coming."  (Pl. Dep.

71:16-16; Lituski Dep. 92:14-15.)  On another occasion, Cassidy referred to Huey as an "old

biker mama," an "old bitch," and an "old biker bitch."  (Huey Dep. 73:19; Lituski Dep. 82:12-

83:5.)  One day as Mr. Cassidy was attempting to open a locked door in the back of the store, he

said "if [Huey] wasn't menopausal, the bitch . . . wouldn't have let[sic] the key in the office," and

"if [Huey] didn't leave the F---king keys in, it wouldn't be locked."  (Lituski Dep. 306:13-15;

307:9-10.)  Cassidy also made age-related remarks about other employees in the office.  For

example, while referring to another employee, Cassidy stated, "her hormones have her crazy,"

and "you know how those hormones are when you hit your 50's."  (Huey Dep. 71:9-10.)

According to Huey, on yet another occasion, Cassidy remarked "you can't teach an old dog new

tricks" and "she's too old to pick this up" when referring to a fellow store employee.  (Huey Dep.

119:2-22.)

    In response to Cassidy's statement that Huey's problems were caused by "menopause,"

Huey complained to the Magnolia store's Executive Assistant ("EXA"), Ms. Allan.  Huey also

complained to Hope Hampton, her fellow assistant manager, about Cassidy's comments.

However, Huey did not complain to the District Manager, Ari Feldman, about any of Cassidy's

age-related remarks.  Nor did she complain to the Store Operations Vice President, the Loss

Prevention Supervisor, the Loss Prevention Hotline, or the Employee Relations Department.

    Huey's problems at Walgreens also extended beyond her relationship with Cassidy.  On a

few occasions between July 2007 and March 2008 she was disciplined for her performance as an

assistant manager.  On November 9, 2007, while Huey was the last employee working the night

shift at Walgreens, she experienced difficulty with a locking mechanism on the office door.

Realizing that the employee opening the store the following morning would be unable to open

the office door, Huey stated that she attempted to notify both Cassidy and Hampton, but was

unable to contact them.  (Huey Dep. 182:6-13.)  As a result, Huey contacted Allan.  Allan

advised Huey to refrain from calling Cassidy, and instead to notify him in the morning.  (Huey

Dep. 182:14-19.)  Huey left a note on the door for the employee scheduled to open the store the

following morning and departed.  The following morning, the employee assigned to the morning

shift could not open the door.  When Cassidy arrived, he opened the door by smashing it with a

hammer.  On December 12, 2007, Cassidy and Allan gave Huey a verbal warning for failing to

follow store procedures.  Huey did not deny that she engaged in this conduct, and acknowledged

that she would have received the verbal warning even if she was under the age of forty.  (Huey

Dep. 186:9-16.)

One month after the door incident, Huey again experienced difficulty with her job

performance.  On December 6, 2007, she did not show up for her shift at work complaining of

back pain.  Huey notified Hampton that she could not report to work, and that she would attempt

to visit a doctor.  However, Huey did not visit her doctor and did not provide Cassidy with a note

from the doctor explaining the reason for her absence.  The following day, Huey reported to work

one hour late due to an alleged stomach condition.  In response to these two incidents, on

December 12, 2007, Cassidy and Allan gave Huey a verbal warning, which provided:

> [Huey] does not have any sick time and needs to attempt to come to work regardless [sic]
> of how she feels.  If she cannot perform her work duties at that time a decision can be
> made.  A doctor[sic] note needs to be presented for any missed time if an associate does
> not have any sick time available.

(Huey Dep. 190:18-24.)  Huey admitted that Mr. Cassidy required all employees to provide a

doctor's note, and that another employee was reprimanded for failing to provide a doctor's note. (Huey Dep. 195:9-13; 202:5-24.)

In addition to her alleged health problems, Huey experienced other difficulties in her employment at the Magnolia store.  Huey received repeated disciplinary warnings for her alleged mishandling of customer checks and other incidents related to her cash-handling duties.  On March 7, 2008, she received a verbal warning for failing to take payment for merchandise from a customer.  In a separate incident on March 14, 2008, Ms. Hampton observed that a cash register was short $16.47 and stated that Huey improperly took $20.00 from the drawer.  Huey received a verbal warning for both of these incidents on March 18, 2008.

In January 2008, both Huey and Ms. Hampton (twenty-two years old) applied for the position of executive assistant.  In order to hold the position of EXA, a candidate must attend the ADSM course.  Twenty-four candidates applied for ten available positions in the course.  Ms. Feldman made the selections for the ADSM course and decided not to select Huey and other candidates who were under the age of 40.  Ms. Feldman informed Huey that she was not selected for the course because she "didn't know enough for the EXA classes, and [] had too many cash-handling problems."  (Huey Dep. 165:15-18.)  Later, Ms. Feldman selected the individuals who received the EXA positions, including Ms. Hampton.  Huey believes that Cassidy did not want her to receive the position of EXA and purposely refused to provide her with the training necessary to qualify for the position.  (Huey Dep. 162:7-10.)

On or about February 25, 2008, Mr. Joseph Camp, the Loss Prevention Supervisor, reviewed a computer-generated list of high-risk sales transactions designed to reveal potential opportunities for theft within the company.  As a result of this review, Camp identified Huey as

an employee with an abnormally high number of high-risk "post-void transactions,"[1] and decided

to conduct an investigation.  Camp also met with Cassidy to review the transactional data from

the electronic journal and compare it to footage taken from a closed circuit television ("CCTV")

of the Magnolia store to identify evidence of impropriety.  Camp then collected other pertinent

data including the number of post-void transactions Huey performed from the time she began

working at the Magnolia store, excluding any post-voids where merchandise was appropriately

re-rung.

     The results of Camp's investigation demonstrated that Huey performed a high number of

unexplained post-void transactions, and a number of transactions that appeared to be "unusual"

or "high risk."  (Ex. P; Camp Dep. 64:16-18; 96:22-97:2.)  First, the CCTV revealed Huey

performing "a number of post-voids consecutively with no record of the transactions being re-

rung," and "post-voids followed by cash counts that were not included in the cash reports."  (Ex.

P; Camp Dep. 64:20-65:21; 67:2-24; 69:3-70:11; Cassidy Dep. 90:13-91:4.)  Despite this

suspicious activity, the investigation revealed no cash overages for the days Huey performed the

post-voids.  Next, on one occasion, Huey post-voided a sale four hours after the customer had left

the store in order to apply a military discount.  However, the investigation produced no evidence

that the merchandise was re-rung.  (Ex. P.)  Third, the investigation revealed that on March 12

---

[1] According to Mr. Camp, a post-void "is a function that management has to eliminate a transaction from the system."  (Ex. P; Camp Dep. 29:14-20.)  When a cashier "ring[s] a transaction and there is an error in that transaction," a post-void enables the cashier to "void the transaction completely . . . and start the transaction over."  (Ex. P; Camp Dep. 29:14-20.)  For the purpose of this opinion, it is important to note that post-void transactions can occur for both legitimate and illegitimate reasons.  For example, when an employee must post-void a sales transaction to apply a consumer discount, she will subsequently re-ring the same merchandise with the discount.  If the employee does not re-ring the merchandise, then there will be a cash overage equal to the amount of original sale.  Thus, an employee may convert the funds by post-voiding a sales transaction, and accepting cash from a purchaser without re-ringing the merchandise.

and 14, 2008, Huey post-voided a transaction in order to apply a military discount that was not applied to the original sale. Strangely, the investigation revealed that the military discount <u>had</u> been applied to the original sale. (Ex. P; Camp Dep. 69:3-6; 167:2-170:15.) Finally, the investigation revealed that on March 12, 2008, Huey post-voided a transaction involving the sale of a razor after the customer departed with the razor. Two weeks later, on March 25, 2008, the investigation revealed that the same customer returned to the store to return the same razor. The customer denied ever returning the razor prior to March 25, 2008. (Ex. P.)

On March 26, 2008, Camp met with Huey in the presence of Ms. Hampton. During the meeting, Camp informed Huey that he conducted an investigation of Huey's sales transactions based on the results of the computer-generated list. Additionally, Camp told Huey what he observed in the CCTV footage as well as the other transaction data. Camp then gave Huey the opportunity to explain the results of the investigation and the CCTV footage. Huey denied any wrongdoing. After completing the interview with Huey, Camp concluded that Huey's explanations for her conduct were unsatisfactory, and Walgreens suspended Huey's employment pending further investigation. After the interview, Camp also spoke with Ms. Feldman, Mr. Todd Lyle, and Stephanie Gaines, the Employee Relations Senior Attorney, to determine how to proceed. After this meeting, Camp informed Cassidy of Ms. Gaines's recommendation. Based on Camp's report, Cassidy decided to terminate Huey's employment.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986). A genuine issue of material

7

fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  Corliss v. Varner, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to

evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the factfinder, not the district court.  BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

In the Amended Complaint, Plaintiff alleges that Defendant violated both the DDEA and Title VII.  Because employment discrimination claims brought under the DDEA are analyzed under the same framework as claims brought under Title VII,[2] this Court will apply the Title VII analysis to Plaintiff's hostile work environment claim and disparate treatment claim.

### A.   Hostile Work Environment Claim

The method and manner of proving a violation of Title VII is the same as proving a violation of the ADEA "when there is no material difference in the question being addressed," and the Third Circuit uses case law under the two statutes interchangeably in the context of employment discrimination.  Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995).  Therefore, this Court will analyze Huey's claims under the two different statutes together.

To state a hostile work environment claim under Title VII and the ADEA, a plaintiff must show that (1) he suffered intentional discrimination because of his race, gender, or age; (2) the

---

[2] Generally, courts in Delaware analyze DDEA claims similar to Title VII claims because the statutes contain similar language.  See Shah v. Bank of Am., 346 F. App'x 831 (3d Cir. 2009) (stating that "the [District Court] limited its analysis to Title VII standards because they are virtually identical to those of the DDEA"); Giles v. Fam. Ct. of Del., 411 A.2d 599, 602 (Del. 1980) (applying the McDonnell Douglas test to a disparate treatment claim brought under the DDEA); Petrocelli v. DaimlerChrysler Corp., No. 04-943, 2006 WL 733567, at *4 (D. Del. Mar. 22, 2006) ("Since claims of employment discrimination under the Delaware [Discrimination in Employment] Act are analyzed in the same way as claims under Title VII, Giles v. Family Court, 411 A.2d 599, 601-02 (Del. 1980), the following analysis uses the Title VII framework, and the conclusions apply equally to the claims of hostile work environment and disparate treatment under the Delaware Act.").

harassment was severe or pervasive; (3) the harassment detrimentally affected him; (4) the harassment would detrimentally affect a reasonable person in that position; and (5) the existence of respondeat superior liability.  Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006); Mowafy v. Noramco of Del., Inc., 620 F. Supp. 2d 603, 615 (D. Del. 2009).

To be actionable, any alleged harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment.  Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001).  This requirement contains both a subjective and an objective component.  Jensen, 435 F.3d at 451 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)).  That is, the alleged harassment must be so severe or pervasive that it not only detrimentally affects the plaintiff but would also detrimentally affect a reasonable person in the same position.  Id.  The factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  No single factor is dispositive; the inquiry must focus on the totality of the circumstances.  Id. at 451-52.  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S 268, 270-71 (2001).

In order to establish the first element of a hostile work environment claim, a plaintiff must prove that the defendant intentionally made comments because of the plaintiff's age. Plaintiff alleges that Defendant's employee, Cassidy made a series of facially discriminatory remarks on the basis of age.  For example, Plaintiff alleges that Cassidy referred to other

employees as "older people."  (Huey Dep. 92:22-23; 93:1-3.)  Furthermore, Plaintiff alleges that Cassidy referred to Plaintiff as an "old biker mama," and an "old bitch."  (Huey Dep. 102:2-8.) Defendant argues that there is no evidence that Cassidy made these derogatory comments because of Plaintiff's age because (1) many of Cassidy's comments do not relate to an employee's age, and make no reference to Plaintiff's age; and (2) Cassidy harassed many of his employees generally – including employees under the age of forty.

Plaintiff satisfies the first element of a prima facie case of a hostile work environment because the evidence demonstrates that Cassidy made a series of remarks because of Plaintiff's age.  On many occasions, Cassidy specifically referred to Plaintiff's age and the age of other employees while making his disparaging remarks.  For example, Cassidy referred to Plaintiff as an "old bitch," and referred to employee Patrice Williams as "old and ugly."  (Huey Dep. 102:2-8; Lituski Dep. 264:13-14.)  Moreover, on one occasion, Cassidy referred to Plaintiff as an "old bitch that's in menopause."  Rather than making generally offensive remarks that implicated Plaintiffs age, Cassidy often referred specifically to Plaintiff as "old" or an "old bitch."  While Defendant correctly notes that many of Cassidy's comments were not age-related, the record is replete with examples of age-related comments Cassidy made directly to Plaintiff.  Because many of Cassidy's comments were facially discriminatory with respect to Plaintiff's age, Plaintiff satisfied the first element of a prima facie case of a hostile work environment claim.

Plaintiff fails to satisfy the second element of a prima facie case.  Although there is some evidence in the record suggesting that Cassidy's comments were pervasive, Cassidy's conduct did not alter the conditions of Plaintiff's employment or create an abusive environment.  The record reveals four incidents where Cassidy made age-related comments specifically to Plaintiff.

11

First, in July 2007, when Plaintiff commented that it was "hot" Cassidy replied, "it's probably menopause." (Huey Dep. 73:11-12.) Second, in September 2007, Cassidy referred to Plaintiff as an "old biker mama" when Plaintiff requested a vacation day to participate in a motorcycle benefit event. (Huey Dep. 78:18-20.) Third, in November 2007, Cassidy referred to Plaintiff as an "old bitch" and stated that he would "kill the old bitch," while he was attempting to open the office door that Plaintiff failed to properly close the previous night. (Huey Dep. 103:2-6.) Finally, Plaintiff alleged that when she was working with a fellow employee, Cassidy remarked, "you can't teach an old dog new tricks." (Huey Dep. 119:18-20.) Significantly, in addition to these four isolated incidents, Plaintiff also asserted that Defendant made comments about older people "all of the time," and that Defendant's comments about older employees generally were "an everyday thing." (Huey Dep. 73:2-5; 79:4-5.) Thus, a reasonable jury could find that when taken as a whole, the four age-related remarks Cassidy made specifically to Plaintiff, and the age-related comments Cassidy made at the Magnolia store on a daily basis, constitute pervasive conduct.

However, Cassidy's behavior did not alter the conditions of Plaintiff's employment or create an abusive environment. When assessing whether conduct is so severe that it alters the conditions of employment, this Court is instructed to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Jensen, 435 F.3d at 451. Only "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment" may

12

liability attach.  <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S. 75, 78 (1998).  Although Defendant's comments were certainly unprofessional and offensive, they were not physically threatening or humiliating, and taken as a whole, they did not create an abusive environment. For example, when Cassidy made the offensive remarks during the locked-door incident, Plaintiff admitted that Cassidy did not intend to kill her, and acknowledged that he was merely "letting off some steam because he was having to break a doorknob off a thing."  (Huey Dep. 103:12-14.)  Plaintiff also admitted that "if I thought for a minute he intended to kill me, I would have been to the police."  (Huey Dep. 103:15-17.)  Additionally, there is no evidence that Cassidy's comments interfered with Plaintiff's work performance or the conditions of her employment.  Although Plaintiff states that she was "praying for a transfer," there is no evidence in the record that Cassidy's conduct interfered with her ability to perform her daily duties as Assistant Manager at the Magnolia store.  Interestingly, throughout the duration of Plaintiff's employment at the Magnolia store, she does not recall reporting Cassidy's conduct to the District Manager, the Store Operations Vice President, the Loss Prevention Supervisor, the Loss Prevention Hotline, or the Employee Relations Department.  Mysteriously, while Plaintiff referred other employees to the Loss Prevention hotline as part of their training, she neglected to use the hotline herself.  (Huey Dep. 246:22-247:9.)  Despite all of the channels of communication available to her, Plaintiff only notified her fellow assistant store manager of Cassidy's age-related remarks.

Moreover, Plaintiff's description of the work environment at the Magnolia store suggests that teasing, joking, and other forms of tomfoolery were prevalent, which also suggests that Cassidy's conduct did not create an abusive environment.  As the Supreme Court stated in

Faragher, the standards for "judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher, 524 U.S. at 788 (quoting Oncale, 523 U.S. at 80). The evidence demonstrates that Cassidy's conduct did not create a hostile or abusive work environment. Instead, Cassidy's conduct, when viewed in the context of the work environment at Magnolia's store, constituted distasteful teasing. For example, when Plaintiff stated that "[Cassidy] always joked that he was younger than us, and that we were all old people," she also admitted that "[he] thought it was funny." (Huey Dep. 79:2-8.) Plaintiff also stated that the environment at Magnolia store was one where people would joke around "quite a bit," and admitted that Cassidy "did a lot of joking and talking and telling [Magnolia employees] of his life experiences." (Huey Dep. 79:14-18.) When asked how she responded when Cassidy remarked "it's probably menopause," after she told him that it was "hot," Plaintiff stated that she "probably snickered, like, in disbelief . . . ." (Huey Dep. 80:20-22.) Furthermore, when asked whether she would tease Cassidy after he mocked her, Plaintiff responded, "I would tease him back. I mean, I wasn't the one that would start it." (Huey Dep. 80:8-9.)

Therefore, drawing all reasonable inferences in favor of Plaintiff, there is insufficient evidence upon which a reasonable jury could find that Plaintiff was subjected to an abusive work environment. Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

**B.      Disparate Treatment Under the Delaware Discrimination in Employment Act**

A plaintiff can make a disparate treatment claim under Title VII by showing that "an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." E.E.O.C. v.

Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990).  A disparate treatment claim under Title VII

comes in two forms.  When a plaintiff produces only circumstantial evidence that age was a

motivating factor in an adverse employment decision, then the appropriate framework under Title

VII is the three-step burden-shifting standard articulated in McDonnell Douglas Corp. v. Green,

411 U.S. 792 (1973).  However, when a party produces direct evidence that age was a motivating

factor in an adverse employment decision, a court must apply the "mixed-motive" analysis

articulated in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  Under the McDonnell Douglas

burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination.

McDonnell Douglas, 411 U.S. at 802.  After a plaintiff has established a prima facie case of

discrimination, the burden of proof then shifts to the defendant, and the defendant must

"articulate some legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct.

Id.  If the defendant produces a legitimate reason for its conduct, the burden shifts to the plaintiff

to show that the defendant's proffered reasons for its conduct were merely a pretext for

discrimination.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  In effect, a plaintiff must

provide evidence upon which a reasonable factfinder could: "(1) disbelieve the employer's

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more

likely than not a motivating or determinative cause of the employer's action."  Id.  To achieve

this end, a plaintiff can demonstrate "a defendant's reasons are so weak, incoherent, implausible,

or inconsistent such that they lack credibility."  Mowafy, 620 F. Supp. 2d at 612 (citing Fuentes,

32 F.3d at 765).  Hence, the McDonnell Douglas standard "places a difficult burden on the

plaintiff" because "it arises from an inherent tension between the goal of all discrimination law

and our society's commitment to free decision making by the private sector in economic affairs."

Fuentes, 32 F.3d at 765.

In a mixed-motives case, "if the plaintiff shows 'by direct evidence that an illegitimate criterion was a substantial factor in the [employment] decision," the burden shifts to the defendant "to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor.'" Brown v. J. Katz, Inc., 581 F.3d 175, 182 (3d Cir. 2009) (citing Price Waterhouse, 490 U.S. at 276). Direct evidence, "must . . . demonstrate[] that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" Walden v. Georgia Pac. Corp., 126 F.3d 506, 513 (3d Cir. 1997) (quoting Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring)). In order to satisfy this standard, direct evidence must "permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendant's] decision." Id. (internal quotation marks and alteration omitted). Significantly, "any statements made by a defendant's employees must be made at a time proximate to the challenged decision and by a person closely linked to that decision." Anderson v. Wachovia Mortg. Corp., No. 09-2275, 2010 WL 3528903, at *4 (3d Cir. Sept. 13, 2010) (citing Walden, 126 F.3d at 513). Furthermore, "'stray remarks in the workplace . . . cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria . . . . Nor can statements . . . by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.'" Walden, 126 F.3d at 513 (quoting Price Waterhouse, 490 U.S. at 277) (internal citations omitted). As the Third Circuit noted in Walden, "a plaintiff must clear a high hurdle to qualify for a mixed motives instruction . . . ." 126 F.3d at 513.

As a threshold matter, the parties dispute the correct legal standard for determining

16

whether a party has a disparate treatment claim under the DDEA.  Defendant argues that in order to succeed on a claim of disparate treatment on the basis of age under the DDEA, a plaintiff must prove that age was the "but for" cause of the adverse employment action.  (Mem. of Law in Supp. of Def. Walgreen Co.'s Mot. For Summ. J. 26) (citing Gross v. FBL Fin. Servs., Inc., 129 S.Ct. 2343, 2350 (2009) and Milby v. Greater Phila. Health Action, 339 F. App'x 190, 191 (3d Cir. 2009)).  Plaintiff argues that the "but for" standard does not apply to this case because the standard articulated by the Supreme Court in Gross only applies to claims brought under the ADEA, not the DDEA.  (Pl. Answering Br. in Opp'n to Def. Mot. for Summ. J. 22-23.)  Plaintiff argues that the DDEA applies the standard used in Title VII cases, not ADEA cases.  Id. at 23 (citing Shah v. Bank of America, 598 F. Supp. 2d 596, 602 n.6 (Del. 2009)).  Although Plaintiff does not provide an alternative standard, it is well-settled that in non-ADEA cases, a plaintiff may succeed on a disparate treatment claim in a "mixed-motives" case by demonstrating that age was "a motivating factor" in an employer's decision making process.  Price Waterhouse, 490 U.S. at 265-66; Brown v. Katz, 581 U.S. at 182.

It is unnecessary for this Court to determine whether the appropriate legal standard under the DDEA is the "but-for" analysis articulated in Gross, or the standard articulated in Price Waterhouse because Plaintiff fails to satisfy the threshold requirement in a so-called "mixed-motives" case of producing direct evidence that age was "more likely than not a motivating factor in the employer's decision."  Walden, 126 F.3d at 513.  In sum, Plaintiff offers a variety of remote, age-related statements made by Cassidy over the course of a nine-month period as "direct" evidence of Defendant's discriminatory intent.  For example, Plaintiff stated that Cassidy referred to her as an "old biker mama," an "old biker bitch," and an "old bitch."  Additionally,

17

Plaintiff also asserts that Cassidy called her "menopausal," and said "that's probably just menopause coming," when Plaintiff complained that she was hot. (Huey Dep. 71:14-16.) Because none of these statements relate specifically to Defendant's decision to take any adverse action against Plaintiff, they constitute mere "stray remarks in the workplace" that have no bearing on any of Defendant's employment decisions. Walden, 126 F.3d at 513.

The only statement offered by Plaintiff that relates specifically to Plaintiff's employment status occurred nine months before Defendant terminated Plaintiff's employment. Plaintiff stated that during July 2007, she overheard Cassidy say that she was "old and slow" and that he was "getting rid of [her]."[3] (Huey Dep. 135:9 - 136:23; Lituski Dep. 70:6-17; 74:13-14.) However, on these facts, a statement so remote in time from Defendant's decision to terminate Plaintiff's employment does not constitute "direct" evidence of unlawful discrimination on the basis of age. See Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("[S]tray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."); Waggoner v. City of Garland, 987 F.2d 1160, 1166 (5th Cir. 1993) ("[A]s we have held on several occasions, a mere "stray remark" is insufficient to establish age discrimination."). Though these statements may suggest that Cassidy harbored some ill-will towards older employees, they do not suggest

---

[3] Defendant argues that Lituski's deposition statements are inadmissible hearsay because they constitute out-of-court statements used to prove the truth of the matter asserted. Defendant correctly notes that this Court may only consider admissible evidence at the summary judgment stage. (Mem. of Law in Supp. of Def. Walgreen Co.'s Mot. for Summ. J. 19 n. 11.) (citing Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 226 n. 7 (3d Cir. 2000)). However, Lituski's deposition statement is admissible under an exception to the hearsay rule. Here, Lituski's statement is not used to prove the truth of the matter asserted; rather it is used to prove Defendant's motive to terminate Plaintiff's employment on the basis of age. Under Federal Rule of Evidence 803(3), evidence that is otherwise inadmissible hearsay, may be used to prove a declarant's "then existing state of mind . . . (such as intent, plan, motive, design, mental feeling, pain, and bodily health.") (emphasis added). Hence, Lituski's deposition statement is admissible hearsay, and therefore this Court may consider it in a motion for summary judgment.

18

that Cassidy made the decision to terminate Plaintiff's employment because of any age-related animus.  Because Cassidy's remarks relating specifically to Plaintiff's employment status did not occur contemporaneously with any of Defendant's adverse employment actions, they constitute stray remarks, and consequently they provide no evidence that Cassidy's actions were motivated by Plaintiff's age.  Accordingly, Plaintiff has offered no evidence upon which a reasonable jury could determine that when taken as a whole, age was "a motivating factor" in Cassidy's decision making process.

Having determined that Plaintiff failed to provide direct evidence that age was a motivating factor in Defendant's decision to terminate her employment, this Court must analyze whether Plaintiff's claim survives summary judgment under the <u>McDonnell Douglas</u> framework. Assuming for the purpose of this analysis that Plaintiff can make a prima facie case of age discrimination under the <u>McDonnell Douglas</u> framework, Plaintiff's claim fails because Defendant offered numerous legitimate, nondiscriminatory reasons for each of its employment decisions, and Plaintiff cannot prove that Defendant's proffered reasons were a mere pretext for unlawful discrimination.

First, prior to the termination decision, Defendant conducted a thorough investigation of Plaintiff's performance as a cashier at the Magnolia store.  Between February 25, 2008 and March 26, 2008, the Loss Prevention Supervisor, Camp, closely monitored each of the suspicious post-voids Plaintiff recorded, and reviewed them with Cassidy.  The results of the investigation revealed that during period under investigation, Plaintiff conducted a variety of suspicious post-voids for which she provided no adequate explanation.  For example, Cassidy and Camp observed Plaintiff performing "a number of post-voids consecutively with no record of the

transactions being re-rung," and "post-voids followed by cash counts that were not included in the cash reports."  (Ex. P; Camp Dep. 64:20-65:21; 67:2-24; 69:3-70:11; Cassidy Dep. 90:13-91:4.)  Significantly, Plaintiff never recorded any cash overages on the days that Plaintiff recorded these post-voids.  (Mem. of Law in Supp. of Def. Walgreen Co.'s Mot. for Summ. J. 12; Ex. P.)  In fact, on one occasion, in order to apply a military discount, Plaintiff post-voided a sale more than four hours after a customer departed from the store.  Strangely, the electronic journal revealed no record that the merchandise was ever re-rung.  In a separate incident, on March 12, 2008, Plaintiff post-voided the sale of a razor after the customer left with the razor. Subsequently, on March 25, 2008 (the day that Cassidy and Camp were reviewing the data from the investigation) the customer who purchased the razor attempted to return the razor.  When asked by Cassidy whether she previously returned the razor, the customer said that she did not. (Ex. P.)

There is also ample evidence in the record to support Defendant's argument that Plaintiff did not receive a promotion to the position of EXA because of Plaintiff's cash-handling problems, not her age.  First, it is important to note that Cassidy had no decision making authority concerning the decision to promote Plaintiff to EXA.  Therefore, any of Cassidy's allegedly discriminatory statements do not impact Defendant's decision not to promote Plaintiff. More importantly, Plaintiff recalls that Ms. Feldman, the District Manager, told Plaintiff that she decided not to interview Plaintiff for the EXA position because "[Plaintiff] didn't know enough for the EXA classes, and [Plaintiff] had too many cash-handling problems."  (Huey Dep. 165:15-18.)  Moreover, Ms. Feldman decided not to interview many individuals under the age of forty for the position of EXA.  (Feldman Decl. Ex. F.)  Although Plaintiff emphasizes that Ms.

Feldman selected Ms. Hampton for the EXA position, Plaintiff acknowledged that Ms. Hampton was qualified the position.  (Huey Dep. 153:8-24.)  Therefore, even taking the facts in the light most favorable to the nonmoving party, Defendant satisfied its burden of proving that Plaintiff's cash-handling problems, not her age, was the reason for its decision not to promote Plaintiff.

Plaintiff's claim that Defendant took various disciplinary actions on the basis of her age also fails.  First, Plaintiff acknowledged that she engaged in the conduct giving rise to each disciplinary action, and that Defendant subjected similarly situated employees under the age of forty to the same disciplinary treatment for the same offenses, or would subject them to the same disciplinary treatment for the same infractions.  For example, with regard to the locked-door incident, Plaintiff stated that an employee under the age of forty would receive a verbal warning for failing to follow store procedures when closing the store at night.  (Huey Dep. 185:24 - 186:17.)  Plaintiff also conceded that any employee at Walgreens would receive a warning for failing to produce a doctor's note after an unexcused absence.  (Huey Dep. at 201:21- 204:11.)  Indeed, Plaintiff even admitted that a similarly situated eighteen year-old employee was disciplined for failing to produce a doctor's note for the same infraction.  Id.  Finally, Plaintiff also admitted that the verbal warnings she received from Ms. Hampton and Cassidy after the alleged cash-handling incidents on March 14th and March 17th, 2008 were not the result of any improper age discrimination.  (Huey Dep. at 214:4 - 215:19.)  Therefore, in light of the evidence offered by Defendant, no reasonable jury could find that Defendant failed to establish adequate, nondiscriminatory reasons for its decisions to issue Plaintiff numerous verbal warnings, deny Plaintiff a promotion to EXA, and terminate Plaintiff's employment.

Because Defendant demonstrated legitimate, nondiscriminatory reasons for each adverse

employment action taken against Plaintiff, Plaintiff must meet the heavy burden of proving that

Defendant's reasons were merely a pretext for unlawful discrimination.  As previously

mentioned, Plaintiff must provide evidence upon which a reasonable factfinder could: "(1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action."  Fuentes v. Perskie, 32 F.3d at 763.  To achieve this end, Plaintiff may

demonstrate "[Defendant's] reasons are so weak, incoherent, implausible, or inconsistent such

that they lack credibility."  Mowafy, 620 F. Supp. 2d at 612.  Plaintiff cannot satisfy this

demanding standard.

     With respect to the employment termination claim, Plaintiff's only explanation for each

of the post-voided transactions was that Cassidy instructed each cashier at the Magnolia store to

delay recording each post-voided transaction until they had multiple-post voids to record.  (Huey

Dep. 240:3 - 241:22.)  However, even accepting as true Plaintiff's contention that Cassidy

instructed her not to re-ring the post-voided transactions immediately, Plaintiff offered no

explanation for three of the suspicious transactions that formed the basis of Defendant's decision

to terminate Plaintiff's employment.  For example, on one occasion, Plaintiff post-voided a sale

more than four hours after the customer departed from the store, but Walgreens' cash

management system revealed that Plaintiff did not report any cash overages that day.  Defendant

alleges that this activity was unusual because a transaction that is post-voided, but never re-rung,

should result in a cash overage equal to the amount of the sale.  (Mem. of Law in Supp. of Def.

Walgreen Co.'s Mot. for Summ. J. 12; Ex. P.)  On another occasion, Plaintiff performed a post-

voided transaction to apply a military discount that had not been applied to the original sale, yet

22

the transaction data demonstrated that the customer received a military discount on the original sale.  Finally, Plaintiff provided no explanation for why she post-voided the sale of a razor that the customer did not return to the store.  The evidence produced by Plaintiff simply fails to demonstrate that Defendant's reasons for each employment action were "weak, incoherent, implausible, or inconsistent . . . ."  <u>Mowafy</u>, 620 F. Supp. 2d at 612.  Therefore, in light of Defendant's extensive investigation of Plaintiff's cash handling performance over a one-month period, and the ensuing results, no reasonable jury could find that Defendant failed to offer legitimate, nondiscriminatory reasons for its decision to terminate Plaintiff's employment.

Regarding Plaintiff's promotion claim, Plaintiff offers no evidence that Defendant's refusal to promote her to the position of EXA was motivated by Plaintiff's age.  Plaintiff's argues that: (1) she was unprepared for the position of EXA because Cassidy refused to equip her with the proper training for the position; and (2) Ms. Feldman told Plaintiff that she had "too many cash handling problems" because Cassidy informed Feldman that Plaintiff was unsuitable for the EXA position.  (Pl. Answering Br. in Opp'n to Def. Mot. for Summ. J. 29.)  However, Plaintiff offers no evidence to demonstrate that either Cassidy's decision not to train her was motivated by age, or that Cassidy's assessment of her cash-handling ability was related to her age.  The evidence offered in support of Plaintiff's assertions does not satisfy the heavy burden Plaintiff must overcome to demonstrate that Defendant's reason for not promoting her was a pretext for unlawful age-based discrimination.  Accordingly, no reasonable jury could find that Defendant's decision not to promote Plaintiff to the position of EXA was motivated by age.

Finally, Plaintiff offers no evidence upon which a reasonable jury could conclude that any of the disciplinary actions taken against Plaintiff were motivated by age.  Plaintiff's sole

argument is the conclusory assertion that each of the disciplinary actions taken by Defendant "were motivated not by Plaintiff's misconduct but Cassidy's (and Hampton's) desire to get rid of her because of her age." (Pl. Answering Br. in Opp'n to Def. Mot. for Summ. J. 30.)  In support of this argument, Plaintiff states that Defendant took the disciplinary actions "without justification and all characterized by Cassidy's refusal to listen to Plaintiff's explanation and, in some cases, to show her the alleged videotaped support for the allegations that she had questioned." (Pl. Answering Br. in Opp'n to Def. Mot. for Summ. J. 30.)  Plaintiff's arguments fail because, as previously mentioned, Plaintiff admitted that she engaged in the conduct giving rise to each disciplinary action, and that other employees would receive the same disciplinary measures for engaging in the same conduct.  Furthermore, Plaintiff's argument that Defendant failed to show her video footage of each cash-handling incident is without merit because Defendant is under no legal obligation to provide Plaintiff with this information.  Moreover, Defendant's refusal to give Plaintiff video footage of each cash-mishandling incident bears little weight on the issue of Defendant's motive for disciplining Plaintiff.  Therefore, mindful of a court's duty to examine each fact in the record in the light most favorable to the nonmoving party, this Court finds that Plaintiff failed to meet the heavy burden of proving that Defendant's reasons for taking the aforementioned disciplinary actions were a pretext for unlawful discrimination on the basis of age.

IV.    **CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' motion to dismiss with respect to Plaintiff's hostile work environment and disparate treatment claims under the DDEA.

The accompanying order shall issue today.


Dated: 9/23/2010            /s/ Robert B. Kugler
                            ROBERT B. KUGLER
                            United States District Judge